# CHARLESTON.

HENNE *v.* SOUTH PENN OIL CO.

Submitted January 28, 1902. Decided December 6, 1902.

1. OIL LEASE—*Forfeiture.*
   The clause of forfeiture in an ordinary oil lease is for the benefit of the lessor and no act of the lessee can terminate the

lease under the forfeiture clause without the lessor's concurrence. (p. 196).

2. OIL LEASE—*Rentals.*

M. & M. by deed dated Oct. 19, 1898, leased certain premises to M. for oil and gas purposes which lease contained the following provisions: "This lease shall become null and void and all rights hereunder shall cease and determine unless a well shall be completed on the said premises within six months from the date hereof, or unless the lessee shall pay at the rate of $25.50 quarterly in advance for each additional three months such completion is delayed from the time above mentioned for the completion of such well, until a well is completed; and it is agreed that the completion of such well shall be and operate as a full liquidation of all rental under this provision during the remainder of the term of this lease." M. the lessee assigned the said lease to S. P. Oil Co., which was the lessee for oil and gas purposes of a large area of territory including all tracts contiguous to the said premises, the S. P. Oil Co., drilled a well to completion April 4, 1900, paying the stipulated rental until the well was completed but which well was "dry." It then removed its material and machinery from the premises and proceeded to drill other wells nearer to developments already made on the line towards the premises in question; *Held:* That under the lease and circumstances of the case the S. P. Oil Co. was entitled to a reasonable time in which to return and make further developments under the said lease. (p. 197).

3. OIL LEASE.

After the completion of said dry well H. prevailed on the lessors in said lease in consideration of three hundred dollars cash to lease to him the same premises for oil and gas purposes which they did, inserting however this clause, "It is further agreed between the parties hereto that this lease is made and this contract entered into subject to a certain other lease and contract made for the same premises by the parties of the first part to M. bearing date on October 19, 1898, and recorded in Deed Book 108, page 375, in the county court of Harrison County; and that the existence of said former lease is made known to the party of the second part and who is fully informed and aware of its terms and conditions." *Held:* The lease to H. was not a declaration by the lessors of unequivocal forfeiture of the first lease. (p. 200).

Appeal from Circuit Court, Harrison County.

Action by Charles B. Henne against South Penn Oil Company. From a judgment for defendant, plaintiff appeals.

*Affirmed.*

Van Winkle & Ambler and Mr. Wells, for appellant.

Fleming & Fleming *and* U. N. Arnett, Jr., for appellee.

McWhorter, Judge:

Sarah S. Martin and D. T. Martin executed and delivered to William Michaels the following lease, under their hands and seals, which was acknowledged by them on the 20th day of December, 1898, and recorded in the clerk's office of the county court of Harrison County on the 28th day of June, 1899, and which was also signed under his seal by said Michaels: "Agreement made and entered into the 19th day of October A. D. 1898, by and between Sarah S. Martin and D. T. Martin her husband, of Sardis P. O., county of Harrison, and State of West Virginia, parties of the first part, and Wm. Michaels of *the* Canton, Ohio, party of the second part;

"Witnesseth: That the said parties of the first part for and in consideration of the sum of one dollar to them in hand well and truly paid by the said party of the second part the receipt of which is hereby acknowledged, and the covenants and agreements hereinafter contained on the part of the said party of the second part to be paid, kept and performed have granted, demised leased, and let unto the said party of the second part *its* successors or assigns for the sole and only purpose of mining and operating for oil and gas and of laying pipe lines and of building tanks, stations and structures thereon to take care of the said products, all that certain tract of land situated in Sardis District, Harrison County and State of West Virginia, on the waters of Catfish Run and bounded substantially as follows: On the north by lands of C. L. Griffin. On the east by lands of A. J. Strother. On the south by lands of Harriet Strother & others. On the west by lands of T. Hagerty, containing one hundred and two acres, more or less, reserving however therefrom five (5) acres around the buildings on which no well shall be drilled by either party except by mutual consent. It is agreed that this lease shall remain in force for the term of ten years from this date and as long thereafter as oil or gas or either of them is produced therefrom by the party of the second part, its successors and assigns. In consideration of the premises the said party of the second part covenants and

agrees, 1st, to deliver to the credit of the first parties their heirs or assigns free of costs in the pipe line to which it may connect its wells the equal one-eighth part of all oil produced and saved from the leased premises; and 2nd, to pay three hundred dollars, *per* for the gas from each and every gas well drilled on said premises the product from which is marketed and used off the premises, said payment to be made on each well within sixty days after commencing to use the gas therefrom as aforesaid and to be paid yearly thereafter while the gas from said well is so used. Second party covenants and agrees to locate all wells so as to interfere as little as possible with the cultivated portions of the farm, provided however, that this lease shall become null and void and all rights hereunder shall cease and determine unless a well shall be completed on the said premises within six months from the date hereof, or unless the lessee shall pay at the rate of twenty-five and 50-100 dollars, quarterly in advance for each additional three months such completion is delayed from the time above mentioned for the completion of such well until a well is completed; and it is agreed that the completion of such well shall be and operate as a full liquidation of all rental under this provision during the remainder of the term of this lease; such payments may be made direct to the lessor or deposited to their credit in the Traders National Bank of Clarksburg, West Virginia. If gas is found in paying quantities parties of the first part to have gas free of cost for the domestic use by making their own con-r:ection at the well. It is agreed that the second party shall have the privilege of using sufficient water from the premises to run all necessary and at any time to remove all machinery *and at any time to remove all machinery* and fixtures placed cn said premises, and further shall have the right at any time to surrender this lease to first parties for cancellation, after which all payments and liabilities to accrue under and by virtue of its terms shall cease and determine and this lease shall become absolutely null and void." On the 22nd day of December, 1898, said Michaels sold, assigned and transferred the said lease together with various other leases to the South Penn Oil Co., of Oil City, Pa., which assignment was duly acknowledged and entered of record in said clerk's office on February 11, 1899. Under this lease the South Penn Oil Co. completed a

well cn or about the 4th day of April, 1900, known as a "dry hole," producing neither oil nor gas. Shortly after the completion of the well the company removed its machinery and appliances from the premises and set up the same for drilling another well on other property near by. On the 2d · day of October, 1900, the South Penn Oil Co. located another well known as No. 2 on said Martin property, and a few days thereafter began work on said well. On the 8th day of October, · 1900, the said Sarah S. Martin and D. T. Martin executed and acknowledged to C. B. Henne, a lease for the same property in consideration of the sum of three hundred dollars paid in hand, which lease was for the term of 10 years, and was in most respects the ordinary oil and gas lease; but contained the following provision: "It is further agreed between the parties hereto that this lease is made and this contract entered into subject to a certain other lease and contract made for the same premises by the parties of the first part to Wm. Michaels bearing date on October 19, 1898, and recorded in Deed Book 108, page 375, in the county court of Harrison County; and that the existence of said former lease is made known to the party of the second part and who is fully informed and aware of its terms and conditions." On the 22d day of October, 1900, C. B. Henne, by his counsel served on the counsel of the South Penn Oil Co. a written notice to the effect that said Martins had leased to him the tract of land in question, for oil and gas purposes and that he understood said company claimed an interest in the land and notified it that by virtue of his said lease he claimed and was entitled to the sole and exclusive right of mining and operating on said premises for oil and gas and of laying pipe lines, building tanks, stations and structures thereon to take care of said produce; that he was informed that any claim said company made arose under a lease made by said Martins dated October 19, 1898, under which it had drilled a well which was completed on or about April 1, and was dry, and that said company had removed its machinery and material from said premises and took no further steps to develop the same for a period of about six months. The property in the meantime had become valuable by reason of operations in the vicinity and that the lessors were advised that under the circumstances the company's lease had terminated and that having

a right to cancel the same made the lease to said Henne, and being informed that said company had recently placed material on the premises with a view to drilling a second well, notified it of his title to said premises and warned it to desist from further operating and tresspassing thereon. Said company without regarding said notice continued its operation of drilling well No. 2 and completed the same and began and completed No. 3, also by the — day ——, both of which wells came in producers of oil in paying quantities. At the January Rules, 1901, Charles B. Henne filed his bill of complaint against the South Penn Oil Co., claiming to be entitled to the possession of the premises under his said lease and having the sole and exclusive right to operate the same for oil and gas; that the defendant company had no right under its lease having abandoned the premises after the completion of the first well and alleged that said company was a tresspasser and committing waste upon said premises, and was causing and did cause irreparable injury and damage to plaintiff and praying that said company be made defendant to said bill and that it and its agents and employes be restrained and enjoined from operating said premises; that a receiver be appointed to take charge of and operate said premises for oil and gas; that the said abandoned lease made by the Martins to Michaels, dated October 19, 1898, be canceled; that an account be taken by the parties of the damages, payable to plaintiff by reason of the trespass and waste committed by the defendant, and defendant ordered to pay plaintiff the amount of said damages and for general relief, exhibiting with his bill copies of both of said leases and of the notice given by plaintiff to desist from trespassing on the premises. On the 19th of February, the defendant filed its answer to said bill denying the material allegations thereof and alleging that it had fully complied with its contract of lease, called the Michaels lease; that it had never abandoned nor intended to abandon its said lease and had paid all rents required to be paid up to the time of the completion of the first well, No. 1, in said lease. The plaintiff moved the court to grant an injunction as prayed for in his bill, of which motion notice was duly accepted and plaintiff filed the affidavits of William C. Edwards, John Worthington and Wilbur Gains; and the defendant reserved the right to file a demurrer to the

plaintiff's bill. Plaintiff replied generally to the answer and by consent the matter of the motion for injunction was continued until "some more convenient season" and permission given to either party to take depositions to sustain their respective pleadings and the answer treated as filed for the purpose of taking depositions of which notice should be given under the usual practice, and depositions were taken and filed in the case, for both parties, and on the 20th day of May said defendant filed its demurrer to said bill and for cause of demurrer said that upon the face of the bill and exhibits therewith plaintiff was not entitled to any relief against defendant, and that at the time of bringing suit and filing of the bill plaintiff had no cause of action nor cause of complaint against defendant; that the estate and lease of plaintiff by virtue of the contract called oil and gas lease to him by the Martins dated the 6th of October, 1900, mentioned in the bill, did not vest in plaintiff any right of possession to, in or with respect to the tract of land therein mentioned, nor to the oil and gas therein until after the expiration of defendant's leasehold rights estate of the defendant held by it under its lease of October 19, 1898, under which defendant took possession of the land and drilled a number of wells for the production of oil and gas, and further that under the said lease made by Martins to plaintiff the right of plaintiff to enter into possession of said land for the purpose of operating therein was made subject to the defendants' lease known as the Michaels lease and were postponed until the estate and rights of defendant had expired and terminated. The cause was heard upon the bill and exhibits, process served and the demurrer of the defendant to plaintiff's bill which was set down for argument, the answer of defendant and general replication thereto, the affidavits, motions and proceedings theretofore filed, upon the several depositions filed by the parties recently and the matters arising on the record and was argued by counsel for the parties and submitted; and upon the 8th day of June, 1901, the court entered the decree that the plaintiff was not entitled to the relief prayed for in his bill, and dismissed the same and decreed that plaintiff pay the costs of defendants with leave to defendant to sue out execution for the same. From which decree plaintiff appealed and says that the court erred in refusing any relief to appellant and in dis-

missing his bill and decreeing against him for costs. The appellant relies almost wholly upon the rule in the case of *Steelsmith* v. *Gartlan*, 25 W. Va. 27. The Michaels lease in question in case at bar however has a very important provision not contained in the lease in the *Steelsmith-Gartlan Case*, and also the circumstances were very different. In case at bar the lease provides for a rental of twenty-five dollars and fifty cents payable quarterly in advance, for all the time delayed beyond the time a well was to be completed until the same was completed, and it was provided: "That the completion of such well shall be and operate as a full liquidation of all rental under this provision during the remainder of this lease." Which provision was fully recognized and understood by the grantors in said lease. The grantor, Mrs. Sarah S. Martin, testified in the case, being examined as a witness for plaintiff Henne and on direct examination was asked "State whether or not you remember telling Mr. Henne at that time that you considered after the South Penn had ceased operation and moved the stuff off that they had lost their lease?" Witness answered "No sir; I did not think the South Penn had lost their lease. If I knew the South Penn had lost their lease there would be no difference to me in leasing to Henne. The South Penn Co. had done their work according to the contract." Fully recognizing the rights of the defendant under the Michaels lease. She also states on cross examination, "Mr. Henne came to our place that night; he wanted us to lease and I told him no, that we would not lease. I thought the South Penn lease was good; that they would come according to the contract; they had paid rental until the dry hole was drilled in and then quit;" and states that she showed Henne a copy of the lease that she had made with Michaels. She was asked "Did he tell you that if you would make him a lease he was willing to take the risk?" She answered "Yes sir, I guess that is what he said. I did not want to lease. I just said this: the day I was in Clarksburg the first time that I came in I did not lease at all. He came to me in the evening and said I will go on better satisfied in my mind to leave the lease just as it is." She also states that she told Mr. Henne that she was looking for a location and that she was expecting a location for another well to be made. A provision in a lease that a failure by the lessee to perform any of

his covenants shall work an absolute forfeiture and the lease thereupon become null and void, is intended for the benefit of the lessor and he has the option either to declare the forfeiture or to affirm the continuance of the contract. In *Bartley* v. *Philips,* 165 Pa. St. 325 it is held: "The clause of forfeiture in an ordinary oil lease is for the benefit of the lessor and no act of the lessee can terminate the lease under the forfeiture clause without the lessor's concurrence. An action of ejectment cannot be maintained against a lessee in an oil lease by a stranger on the ground that the lessee had abandoned the premises where there is no evidence that the lessor had exercised his right to forfeit the lease;" and at page 329 it is said in the opinion of the court, "Even if there had been a want of due diligence and an abandonment by plaintiffs, no one could take advantage of it but the lessor or one succeeding to his rights, and there was no such party yet in the case. * * * The error of the appellees, and apparently of the court below, was in regarding the estate of plaintiffs under the lease as terminated *ipso facto* by the failure in diligence or the abandonment. But it required the act of the lessor. Repeated decisions of this Court from *Wills* v. *Gas Co.,* 130 Pa. 222, to *Cochran* v. *Pew,* 159 Pa. 184, have established that the clause of forfeiture or termination of the estate is for his benefit, and no act of the lessee can produce that result without his (the lessor's) concurrence. Still less can any action of a stranger enforce it. As against any but the grantor, an abandonment is not complete until the statutory period of limitation, or the end of the term granted, and possession may be resumed by the grantee at any time previous." Appellant cites *Munroe* v. *Armstrong,* 96 Pa. St. 307. In that case the work of boring for oil was to be commenced in ten days and continue with due diligence until success or abandonment, and if the lessee failed to get oil in paying quantities or ceased to work for thirty days at any time the lease was to be forfeited and void. It was held "That if the lessees failed to get oil in one well that they had a right to put down another and as many more as they pleased so long as they worked with diligence to success or abandonment," and further "That a cessation of work for thirty days forfeited the lease." The lessees commenced and completed a well and kept their covenants up to October, 1877. From the first of Novem-

ber, 1877, until July, 1878, they ceased operation and did no work. The lessees assigned their lease to Armstrong, who in the latter part of July, 1878, put down a well and was successful in getting oil. Reep, the owner of the land had again leased the premises to Munroe, which was intended as and was an act of forfeiture, of which lease Armstrong had knowledge when he took the assignment from the original lessees and before commencing his operations had express notice not to come on to develop and expend money on the property. Here the lessor had taken action and exercised his right to forfeit the first lease, but leased the property to Munroe after the first lessees had ceased for more than thirty days to operate and which was brought to the notice of Armstrong the assignee. This can be of no benefit to the appellant in case at bar, in which the lessors had not only taken no steps to forfeit the Michaels lease or treat it as invalid even if they had a right to do so under its provisions, but they had notified the would be lessee, Henne, of the existence of the Michaels lease and notified him that they were expecting the lessee under said lease to locate and operate another well, and had informed Henne that the defendant had kept its contract, and when he prevailed upon them to give him the lease, they would not do so without inserting therein a clause to the effect that the same was subject to the said Michaels lease and that the existence thereof was made known to Henne, who was fully informed and aware of its terms and conditions. How different the circumstances in the *Steelsmith Case.* In that case the lessor, Matilda McGregor, realizing the fact that the lessee who drilled the "dry hole," by his abandonment of the premises had forfeited his lease, but further realizing the fact that he had spent and lost a large sum of money in the operation, in a commendable spirit of fairness, but desiring no further delay should be had in developing her property, notified Gartlan the lessee time after time to come on and again drill, desiring that he should have the preference, refusing to lease to others even at a considerable bonus, and notifying him that unless he proceeded under his lease she would have to lease to others, which she finally did before Gartlan attempted to further develop the premises under his lease. The leasing again by the lessor after the abandonment by the lessee and after notification to the lessee upon his further

delay to develop the premises that she would lease to another was an affirmative and positive act on the part of the lessor of forfeiture of the lease to Gartlan.  In *Stone* v. *Oil Co.,* 188 Pa. St. 602, (Syl. pt. 2), it is held: "Where an owner of land executes an oil and gas lease, and, subsequently, after a default in the payment of rental, but without any declaration of forfeiture, executes a second lease to other parties, in which it is expressly provided that' such parties should stand between him, 'and all who may have claims to this lease,' the execution of the second lease is not a declaration of forfeiture of the first lease." In the opinion of the court in that case, at page 609, it is said that the clause in the second lease, that the lessee, the Marshall Oil Co. should stand between the lessor and all persons claiming an interest in the lease, was plain warning that the lease might be contested, and yet notwithstanding that knowledge and that plain warning, they took the lease with their eyes open and must have known that in procuring the second lease from the lessor, the Marshall Oil Co. was guilty of bad faith if not manifest fraud towards the former lessee; and it is further said in said opinion that the clause providing that the lessee should stand between the lessor and "All who may have claims to this lease" means "All who might have claims to the leased premises under a former lease."  This clause proves two things; first, it was not an act on the part of Grimes (the lessor) intended to declare a forfeiture; and second, that' the Marshall Oil Co. knew that fact and took that lease with full knowledge that there might be a contest and voluntarily assumed the risk." In *Aye* v. *Philadelphia Co.,* 193 Pa. 451, (Syl. pt. 1), it is held: "Where an oil lease provides for the completion of a test well within a certain time, but makes no provision for the contingency of the test well proving dry, there is an implied obligation on the lessee, after having completed a test well which has proved dry, to proceed further with the exploration and development of the land with reasonable diligence according to the usual course of the business, and a failure to do so amounts to an abandonment which will sustain a re-entry by the lessor.  In such a case an unexplained cessation of operations for four years gives rise to a fair presumption of abandonment, and standing alone and admitted would justify the court in declaring an abandonment as a matter of law; but it

may be capable of explanation, and the question of abandonment is therefore usually a question for the jury on the evidence of the acts and declarations of the parties." And at page 456, in the opinion of the court it is said: "Abandonment is a question of fact to be determined by the acts and intentions of the parties. An unexplained cessation of operations for the period involved in this case (four years) gives rise to a fair presumption of abandonment and standing alone and admitted would justify the Court in declaring an abandonment as matter of law. But it may be capable of explanation and is therefore usually a question for the jury on the evidence of the acts and declarations of the parties." It is insisted by the appellee that the contention of the defence in claiming that this case is not ruled by *Steelsmith* v. *Gartlan,* is that the South Penn Oil Co. had leased a large area of contiguous land from numerous owners and that there can be no doubt that if the original lessee, Michaels, had not assigned his lease to the South Penn Co., and had completed the well himself in April, 1900, and then abandoned the property and moved all his aparatus away he would certainly have been directly within the rule laid down in the *Steelsmith-Gartlan Case;* that the Michaels lease was a distinct and separate contract and the rights of the Martins under it were exactly the same as though there had been no other lease in the universe. This is a very plausible argument. It is true that the lease was a distinct and separate contract from all other contracts and the rights of the lessors thereunder were the same as they would have been without the existence of any other lease in the world; but it is true also that the circumstances of the parties have largely to do with the fact of the intention of abandonment. It must be presumed that the location of oil wells is at least to some extent dependent upon scientific principles. There was good reason to believe that there was oil some where on the premises in question and the appellee in locating the well No. 1, on the lease had made a mistake. It was possessed of all the contiguous territory. The most natural as well as the most reasonable thing for it to do, as it did, was to remove to a locality nearer the developments already made and to develop in the direction of the premises in question, so as to strike the line of the oil belt and thus be enabled more judiciously to locate

another well on the premises where it would be more likely to find the oil it was seeking, and the fact that it owned all the surrounding territory for oil purposes makes it very improbable, indeed, almost certain, that it had no purpose of abandoning any one of its leases which was as this was surrounded entirely by its own holdings. If Michaels, the original lessee or any other individual or company holding the lease of a small property, and having no other within his reach or in the neighborhood, and if he should have undertaken and drilled a well on the premises to completion and finding it produced nothing, should remove his machinery and all his apparatus from the premises, it might raise a strong presumption that he had abandoned the property or at least that he did not propose within a very short time to locate and operate another well on the same premises. In *Schaupp* v. *Hukill,* 34 W. Va. 375, (Syl. pt. 1), "F. having given 'one oil' lease to H. afterwards gave another 'oil lease' of the same property to S. on which second lease was endorsed before execution 'this lease to be taken subject to the E. M. Hukill lease;' held: the second lease is not an unequivocal declaration of forfeiture of the first lease:" It is very clear from the record that the lessors did not intend a forfeiture of the Michaels lease held by the appellee; that Henne the junior lessee had full knowledge of the lease and expressed himself as willing to take all risk, in making his lease subject to the Michaels lease. In giving his testimony in the case, Henne on examination-in-chief says that in talking over the lease, in regard to making it subject to the Michaels lease, "I said that I did not care how strong they put their clause, that I was not afraid of that old lease, and that they could put it just as strong as they like, any more than I did not consider the old lease any good under the conditions they had made." On cross examination he admitted that sometime after the making of the lease, towards the latter part of October, he was at the Martin farm or residence and asked them to change the lease that they had made to him, so that it would in substance read that his lease was subject to the Michaels lease, provided that lease remained in force or effect; that he asked to have this modification made under the advice of counsel. Mrs. Martin in her testimony says: "Mr. Henne

told me that having the lease subject to the other one, left their lease in full force just as it was, and the South Penn platform was to be left out, the lease being subject protected us both, me and the South Penn. That's what I was aiming to do."

On re-direct examination by plaintiff's counsel Mrs. Martin was questioned as follows: "After the South Penn had completed their well on the farm about the 1st of April, 1900, and had withdrawn the casing and removed the same and had removed the derrick, and after the period had passed when they should have paid the rental, how did you regard the lease to the South Penn Oil Co?" "Well I regarded it just as it was." Q. "Did you, or did you not regard their lease as still holding the farm after they had done these things and failed to pay rental?" To which she answered, "I could not think any other way, could I, according to the contract of the lease? That's that they would pay no more rental after the first well was completed." The evidence, to my mind, taken together with the circumstances of the case is clear that the defendant never abandoned nor intended to abandon the lease nor the premises; but only left it temporarily until they could get their proper bearings to enable them to properly locate the second well. It appears that after removing their drilling machinery from the farm they diligently and intelligently prosecuted their operations from the point of their last development towards the premises in question, in order to determine the line of the oil and gas producing sand, as located through the premises in question, and that by so doing they were enabled to make a judicious location of the second well early in October, when the defendant began to drill diligently and completed the well in a reasonable time; and it is further clear that the lessors had no intention of seeking to forfeit the Michaels lease but were expecting all the time the defendant to develope their property under the said lease. It is further clear from the evidence that the lessors were induced to make the lease to Henne for the money consideration given them by him and which they refused to do until he would take the lease subject to the Michaels lease, which they felt bound them in all good conscience; and the lessee was evidently misled by what he considered the rule laid down in the *Steelsmith-Gartlan Case,* and in trying to over-

reach the defendant operating under the Michaels lease he over-reached himself.

In *Tate* v. *Liggat,* 2 Leigh 84, Syl., it is held: "If A. make a fraudulent conveyance of personal property to B. and then make a conveyance for valuable consideration to C. who has full notice of the previous fraudulent conveyance, the statute of frauds and perjuries does not apply to protect such a subsequent purchaser against the previous fraudulent conveyance, nor upon the principles of the common law can he claim against the previous fraudulent conveyance whereof he had notice when he purchased." As we have seen in the case of *Bartley* v. *Phillips,* cited, that the question of abandonment is a mixed question of fact and intention and in case at bar both fact and intention to abandon the lease or premises are denied by the defendant, and there is no evidence tending to prove abandonment or the intention to abandon the premises by the appellee, except the mere fact that the well No. 1, being completed and proving a failure the defendant abandoned the well, not the lease. The evidence of all the agents and operators of the defendant is to the effect that there was no intention to abandon the lease or premises, but that it was the intention all the time to further develop the property, and it is very evident that appellee in good faith pursued the most reasonable and intelligent course to properly develop the premises.

I see no error in the decree and the same will be affirmed.

*Affirmed.*

NOTE BY DENT, PRESIDENT, (*concurring*):

In addition to those pointed out by JUDGE McWHORTER, I desire to call attention to a further vital distinction between the lease in *Steelsmith* v. *Gartlan* and the lease in the present case. In the former there was express covenants as to the extent of the explorations to be made by the lessee and these necessarily exclude all implied covenants. In short it was provided that if the first well drilled produced twenty barrels per day for thirty days further wells were to be drilled. The converse of the proposition is thus established that if the first well did not produce twenty barrels per day no further explorations

were to be made, but the lease was at an end unless enlarged by consent and agreement of parties.

In the present lease there is no express covenants as to further operations but they are left to be implied by law which simply requires due diligence under the facts and circumstances.

In the former case the drilling of a dry hole satisfied the terms of the lease and produced death. In the latter the drilling of a dry hole nullified the forfeiture clause of the lease and extended its life, subject to such covenants as to further explorations as the law might imply.

These propositions are made so plain in the opinion in *Steelsmith* v. *Gartlan* that it is hard to understand why they should be so misunderstood.